No. 77,688

In the Matter of PATRICK S. DOW, *Respondent.*

933 P.2d 666

Opinion filed March 7, 1997.

*Frank D. Diehl*, deputy disciplinary administrator, argued the cause, and *Mark F. Anderson*, disciplinary administrator, was with him on the formal complaint for the petitioner.

*Michael P. Whalen*, of Patton, Davis & Putnam, of Emporia, argued the cause for the respondent.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Patrick S. Dow, respondent, a Eureka attorney, admitted to the practice of law in Kansas.

Three complaints filed against the respondent alleged that the respondent violated MRPC 1.1 (1996 Kan. Ct. R. Annot. 257) (competence); MRPC 1.2 (1996 Kan. Ct. R. Annot. 261) (scope of representation); MRPC 1.3 (1996 Kan. Ct. R. Annot. 264) (diligence); MRPC 1.4 (1996 Kan. Ct. R. Annot. 270) (communication); MRPC 1.7 (1996 Kan. Ct. R. Annot. 283) (conflict of interest); MRPC 1.16 (1996 Kan. Ct. R. Annot. 310) (declining or terminating representation); and MRPC 8.4 (1996 Kan. Ct. R. Annot. 350) (misconduct); and Supreme Court Rule 207 (1996 Kan. Ct. R. Annot. 205).

The three complaints were consolidated for purposes of this proceeding and heard before a panel of the Kansas Board for Discipline of Attorneys. The Disciplinary Administrator appeared by and through Frank D. Diehl, Deputy Disciplinary Administrator. The respondent, having been personally served, failed to appear. Based upon clear and convincing evidence, a unanimous panel made the following findings of facts and conclusions of law:

## COUNT I
### McGLOTHLIN COMPLAINT—CASE NO. B5857

"2. The Complainants, Steve and Karla McGlothlin, have a son, Jude Nathaniel

(Nate) McGlothlin, with severe autism. During Nate's preschool years, the McGlothlins worked with expert consultants to develop an intensive in-home developmental program for Nate. In the 1992 to 1993 time period, Nate was seven years old and the McGlothlins had concerns about getting the Lawrence public school system to provide, what Complainants believed to be an appropriate [individualized education program] (IEP) for their son. They wrote letters to the Director of Special Education for the Lawrence school system which included numerous suggestions to ensure appropriate planning for Nate's educational needs after his first year in kindergarten. The Complainants sought an attorney to represent them who had experience in such matters because they felt the Lawrence school system had been unresponsive to Nate's special needs in kindergarten.

"3. A group called 'Families Together,' referred the McGlothlins to the Respondent whose office is located in Eureka, Kansas. The respondent has a child with autism and both Respondent and his wife, a non-lawyer, are active in matters involving children with autism.

"4. The initial meeting between the Respondent and the Complainants occurred in April 1993. Complainants drove to Eureka and met with Respondent in his home and had an opportunity to observe Respondent's son and be introduced to his wife. The McGlothlins explained to Respondent that they had been successful in the home training of their son, but that they sought Respondent's representation at an [IEP] meeting with a member or members of the Lawrence public education system.

"5. In May of 1993, at Respondent's request, the McGlothlins provided him with a list of documents concerning their son's condition and copies of letters previously sent to the Lawrence Public School Administration. Respondent promised to review this material and begin within a few days to assist the McGlothlins with obtaining an appropriate educational program for Nate.

"6. The McGlothlins did not hear from Respondent for some period of time and began calling his office and home telephone numbers. They were unable to reach him. They were told that Respondent was not in or they left messages on Respondent's answering machine, but the messages were unanswered. The complainants finally reached Respondent in early June 1993, at his office. Respondent at that time told the McGlothlins that his wife had received special training in working with children with autism using a model promoted by 'TEACCH.' The TEACCH model meets the child at his or her functional level and adapts the environment to the child.

"7. At a meeting in Lawrence with the Complainants on June 23, 1993, Respondent observed the McGlothlins' son, Nate, and asked for a $2,000.00 retainer which was paid. The McGlothlins requested that Respondent discuss certain needs of their child, but were informed by Respondent that this was unnecessary because his wife would soon be in touch to prepare an appropriate [IEP] for Nate. The McGlothlins agreed to pay Respondent $40.00 per hour and requested a written fee agreement. Respondent told them a written agreement was not nec-

essary and did not put the fee agreement in writing. Shortly thereafter, the McGlothlins then telephoned Respondent to set up a meeting to write the IEP with Mrs. Dow. Between June and August, 1993, Mrs. Dow canceled two appointments the Complainants made with her. Finally in August, the meeting between Mrs. McGlothlin and Mrs. Dow took place at a restaurant in Lawrence and lasted only about ten (10) minutes. It consisted of Mrs. Dow giving Mrs. McGlothlin a questionnaire to fill out. Mrs. Dow promised to conduct a follow-up meeting to discuss the preparation of the IEP, but no such meeting occurred.

"8. After not hearing from Respondent for approximately five (5) weeks, the McGlothlins reached Respondent who said that he would write to the school district to schedule an IEP meeting. Respondent sent two (2) letters to Dr. Donald Herbel, Director of Special Education, of the Lawrence school district. The first letter asked for a meeting to discuss the educational program of Nate McGlothlin and the second letter requested a formal IEP meeting to be scheduled.

"9. A preliminary meeting with the school district was scheduled for August 30, 1993. The Complainants received no information from the Respondent about the meeting and were upset because of this lack of communication. The Respondent assured the Complainants in a telephone call that he would be ready for the August 30, 1993, meeting with the school administrator.

"10. The meeting on August 30, 1993, was scheduled to begin at 10:00 o'clock a.m. Respondent arrived only a few minutes before the meeting was to begin and presented the McGlothlins with an agenda of the meeting which the Complainants had not previously seen or discussed with him. The agenda specifically recommended the TEACCH model for Nate despite the fact the Complainants had advised Respondent they opposed the TEACCH model for their son. The complainants, however, felt that Respondent would address their concerns in the information they had previously provided to him. Due to the fact the parties were present for the meeting, the Complainants decided to proceed with it.

"11. During the meeting with the school administrator, the Respondent presented a teaching model designed by 'TEACCH' which involves the placing of children with autism primarily in self-contained classrooms. The Complainants, from the beginning, made Respondent aware of their objection to placing children with autism in a classroom together without interaction of other students. Their wishes were outlined as well in their letters to the school administration previously supplied to the Respondent. The Complainants were forced to inform school board representatives during the meeting that they disagreed with their attorney's presentation. After the meeting, the Complainants learned that Respondent had used the model developed by TEACCH with his own child in Eureka. They felt he was advocating his own position rather than their position in front of the Lawrence school board. This was the first time Respondent made the McGlothlins aware that he did not agree with their educational plan for Nate.

"12. With an IEP meeting fast approaching, the Complainants were in contact with Respondent to represent them and to follow their wishes as to their child's educational program. Respondent for the first time refused to represent them

unless he was allowed to advocate the TEACCH model. Respondent informed the McGlothlins that the method of teaching they had adopted for their son was 'ineffective and piecemeal' and TEACCH was the only effective method of dealing with autism. After discussing their differences in philosophy, Respondent withdrew his representation of the McGlothlins at the IEP meeting, with only two (2) days' notice. Respondent told the Complainants he would send them another bill for his legal services. Complainants requested an itemization of services rendered. Respondent had no answer when the McGlothlins asked why he would not present the position that they asked him to present to the school board. He did indicate his wife was upset and could not work with a particular school staff member who had been hired by the school board for a position which Mrs. Dow had applied.

"13. Because Respondent withdrew shortly before the scheduled IEP meeting, the McGlothlins canceled the meeting and began searching for a new attorney. A whole year passed before they could find another attorney who felt qualified to handle their case. Mrs. McGlothlin had accepted employment which she had to resign in order to direct Nate's home schooling program. Appropriate educational programming was not developed for Nate until August, 1995. Nate spent his 1st grade year with home schooling.

"14. The McGlothlins lodged a complaint against Respondent and Michael Crow, an attorney in Leavenworth, Kansas, was assigned to investigate. He wrote three (3) letters to Respondent: February 7, February 17, and February 28, 1994. He also telephoned Respondent on February 25 and March 9, 1994. Mr. Crow finally reached Respondent and they met in Mr. Crow's office on March 30, 1994. At that meeting, Mr. Crow requested Respondent's time slips. They were never provided. Mr. Crow described Respondent's level of cooperation in the investigation as 'begrudging.' Respondent told Mr. Crow Respondent had more knowledge than the McGlothlins about what was appropriate for their son and refused to consider alternatives to the TEACCH model.

"15. By letter dated October 26, 1994, the Office of the Disciplinary Administrator informed Respondent that the Review Committee had found probable cause to believe that the Respondent had violated the standards of professional conduct and responsibility and that the discipline of informal admonition was to be imposed for violation of MRPC 1.2 and Supreme Court Rule 207. Respondent was directed to appear on November 10, 1994, at the Office of the Disciplinary Administrator for imposition of the sanction of informal admonition.

"16. Respondent appeared on November 10, 1994, and disagreed with the Complainants' allegations. Chief Deputy Disciplinary Administrator, Stanton Hazlett, agreed to let Respondent file additional information for the Review Committee by December 1, 1994.

"17. Another letter was sent by Mr. Hazlett on December 12, 1994, asking why no response had been filed by Respondent. Respondent failed to respond to that letter as well as a letter of February 9, 1995. The February letter told Respondent that he could accept an informal admonition or a formal complaint would be filed on the McGlothlin allegations, as well as Respondent's failure to cooperate. Re-

spondent was given a deadline of February 20, 1995, to answer the letter of February 9, 1995. Mr. Hazlett's letter was sent by certified mail, restricted delivery, and Respondent signed for the letter on February 21, 1995. Respondent failed to respond to these letters and again failed to cooperate in any way."

Based upon the above findings of fact, the panel concluded that clear and convincing evidence established that respondent's actions and behavior amount to violations of MRPC 1.2, 1.4, 1.7, 1.16, and 8.4, and Supreme Court Rule 207.

## COUNT II
### RODRIGUEZ COMPLAINT—CASE NO. B6061

"18. Lanette Rodriguez hired Respondent to represent her in legal matters after the death of her husband, Mark Rodriguez, in a vehicle accident on February 18, 1993, in Allen County, Kansas. Mark Rodriguez died intestate, leaving his wife and minor child. Respondent agreed to handle a personal injury claim, a child in need of care case, an insurance claim and generally any probate proceedings necessary to handle the estate of Mark Rodriguez.

"19. Mrs. Rodriguez paid Respondent $4,000.00 to represent her.

"20. Respondent failed to open probate proceedings in the estate of Mark Rodriguez. Mrs. Rodriguez, after two and one-half (2½) months, fired Respondent as her attorney in the child in need of care case and hired Fred Works.

"21. Respondent continued to represent Mrs. Rodriguez in negotiating the death settlement with the insurance company. After a year had passed and nothing was accomplished to her satisfaction, Mrs. Rodriguez consulted with Diane Barger, an Emporia lawyer.

"22. On June 16, 1994, Lanette Rodriguez sent a letter to Respondent informing him that she was terminating his representation in the death claim case and that she would retain a different lawyer.

"23. On June 20, 1994, Diane Barger sent a letter to Respondent informing him that she was Mrs. Rodriguez's new lawyer and asking Respondent to forward copies of the Rodriguez file to her at Ms. Barger's expense.

"24. On June 24, 1994, Lanette Rodriguez sent a letter to Respondent requesting that her file be sent to Diane Barger, no later than July 1, 1994. Ms. Barger then attempted to telephone Respondent and left messages on his answering machine on June 20 and June 24, 1994. Respondent did not respond to these calls.

"25. On July 5, 1994, Ms. Barger was successful in reaching Respondent by telephone. Ms. Barger again requested the Rodriguez file be sent immediately. Respondent assured her this would be done. On August 4, 1994, Mrs. Barger telephoned Respondent because she had not received the file and left a message on his answering machine. He did not return the call. As of September 14, 1994, Ms. Barger still had not received the Rodriguez file from Respondent. She sent

a letter requesting the file and informed Respondent a disciplinary complaint would result if he failed to comply with the request. Ms. Barger never received the file from Respondent or response.

"26. David Andreas, a Winfield attorney, was assigned to investigate Mrs. Rodriguez's complaint. Mr. Andreas wrote to Respondent on September 22, 1994, October 13, 1994, and October 27, 1994, asking Respondent for a response to the complaint. Respondent did not respond to these letters, nor did he respond to telephone messages. By letter dated December 2, 1994, Ms. Barger provided Mr. Andreas with a summary of her involvement with Mrs. Rodriguez and attempts to obtain the file from Respondent. Respondent did not cooperate with the investigation in any way."

Based upon the above findings of fact, the panel concluded that clear and convincing evidence established that the respondent's actions and behavior amounted to violations of MRPC 1.3, 1.4, and 1.16, and Supreme Court Rule 207. The panel further concluded that the evidence did not establish a violation of MRPC 1.1 in Count II and dismissed that claim.

## COUNT III
### WAGNIERE COMPLAINT—CASE NO. B6061

"27. Respondent was the lawyer for Marge Fudala and Grace Wagniere in a guardianship and conservatorship for Grace Strimple, the mother of Mrs. Fudala and Mrs. Wagniere. The guardianship and conservatorship terminated upon the death of Mrs. Strimple.

"28. On or about March 24, 1992, Mrs. Wagniere sent a $300.00 check to Respondent for legal services to handle the opening of the probate estate. Respondent failed to open probate proceedings on the estate of Mrs. Strimple or account for the $300.00 retainer which was provided by Mrs. Wagniere. Neither Mrs. Fudala nor Mrs. Wagniere were informed of a reason as to why the matter did not proceed by Respondent.

"29. On February 1, 1995, Mrs. Fudala sent a letter of complaint to the Disciplinary Administrator alleging that Respondent had done nothing and had failed to keep his clients informed.

"30. Wallace Davis, an El Dorado attorney, was assigned to investigate the complaint. On February 22, 1995, Mr. Davis wrote to Respondent asking him to respond to Mrs. Fudala's letter within fourteen (14) days.

"31. On March 24, 1995, Mr. Davis had a personal conversation with Respondent about the matter and on April 10, 1995, Mr. Davis again wrote to Respondent asking him to respond to the complaint.

"32. On April 26, 1995, Mr. Davis saw Respondent at the courthouse in Eureka, Kansas, and spoke with him. Respondent said he would have a response to Mr.

Davis no later than the close of business on April 28, 1995. Respondent never responded to Mr. Davis' repeated requests for information regarding the Wagniere/Fudala complaint."

Based upon the above findings of fact, the panel concluded that clear and convincing evidence established that the respondent's actions and behavior amounted to violations of MRPC 1.3, 1.4, and 8.4(c), and Supreme Court Rule 207.

## AGGRAVATION/MITIGATION

"Due to the findings that Respondent has violated the disciplinary rules by clear and convincing evidence, the panel next determined the measure of discipline to recommend. In reaching its decision, the panel has considered the following findings of fact in aggravation:

"1. Respondent received prior discipline in 1991 when he was informally admonished in Case No. B4648 pursuant to Supreme Court Rule 203(a)(4) for failure to act with reasonable diligence and promptness in violation of MRPC 1.5.

"2. Respondent's advice to the McGlothlins appears to be motivated by personal reasons, rather than the best interests of his clients. He has failed to account for monies paid to him by all Complainants indicating a dishonest and selfish motive.

"3. Evidence presented at the hearing established a pattern of misconduct in these complaints before the hearing panel and multiple offenses being committed.

"4. Respondent repeatedly failed to cooperate in the investigation regarding the complaints lodged against him and clearly obstructed the disciplinary proceedings by failing to comply with the rules and process.

"5. Respondent failed to appear for the hearing. The testimony presented at the hearing established Respondent refused to acknowledge the wrongful nature of his conduct.

"6. Because the Respondent failed to appear for the hearing, the reasons for his conduct are unclear to the hearing panel. Both Mrs. McGlothlin and Mr. Hazlett testified that Respondent appears to be overwhelmed with the needs of his autistic son and resulting personal problems. The panel notes, however, that Respondent presented testimony in mitigation at his earlier disciplinary proceeding in 1991 citing family concerns due to his son's condition. Therefore, the panel is not persuaded that Respondent's personal family problems are mitigating factors in this case.

"The panel finds no mitigating facts in this case."

The panel adopted the recommendation of the Disciplinary Administrator that the respondent be disciplined by suspension from the practice of law for an indefinite period pursuant to Rule 203(a)(2) (1996 Kan. Ct. R. Annot. 193) and costs be assessed against the respondent in an amount certified by the Disciplinary

Administrator. The panel further expressed its belief that in the best interests of justice, the public welfare, and the legal profession, the respondent should be suspended from the practice of law during the pendency of disciplinary proceedings filed against him.

In accord with the expressed belief of the panel and on motion filed by the Disciplinary Administrator, a show cause order was issued by this court directing that the respondent appear in person or by counsel before this court on October 25, 1996, at 9 a.m., to show cause why he should not be temporarily suspended from the practice of law pursuant to Supreme Court Rule 203(b). The respondent failed to appear before this court or respond to the show cause order, either in person or by counsel. Accordingly, on November 22, 1996, this court temporarily suspended the respondent from the practice of law in Kansas until the pending disciplinary proceedings against him are finally resolved by this court or until further order of this court. The respondent remains temporarily suspended from the practice of law in Kansas.

A copy of the final hearing report, including the findings of fact, conclusions of law, and recommendations of the Board, was mailed to the respondent. More than 20 days have passed since this mailing. The respondent has not replied or taken issue with the final hearing report.

One day before this matter was heard before this court, Michael P. Whalen entered his appearance on the respondent's behalf in this matter. On the day set for hearing, the respondent appeared in person and by and through his attorney, Michael P. Whalen.

On behalf of the respondent, his counsel argued that the respondent was suffering from depression and was, at this time and at all the times throughout these proceedings, disabled. Counsel argued that the respondent has been and is overwhelmed with the needs of his autistic 15-year-old son and resulting personal problems. All actions and behaviors resulting in the above disciplinary violations resulted because of the respondent's total commitment to the care of his 15-year-old son.

We have no doubt that the problems the respondent must deal with on a daily basis are real and oppressive. We note that the previous disciplinary complaint resulting in an informal admonish-

ment was lodged against the respondent for his actions in 1988. In the previous disciplinary complaint, the panel noted that "[i]t is also significant to note that during the time in question [1988-1989] the respondent was experiencing personal difficulties with one of his children which may have contributed to his lack of attention." The present complaints involve the respondent's actions during the years 1992, 1993, 1994, 1995, and 1996.

At this late date, counsel asks· that the respondent's case be remanded to the Kansas Board for Discipline of Attorneys so that the respondent may have an opportunity to present additional evidence concerning his problems with his son and the effect those problems have upon his ability to practice law. The respondent has been given numerous opportunities to address his concerns, including two attorneys appointed to investigate the complaints filed, to the office of the Disciplinary Administrator, and to the panel appointed to hear the complaints. Additionally, this court provided the respondent with an opportunity by way of show cause order for him to appear personally or through counsel and present argument why his license should not be temporarily suspended. All such opportunities were not only ignored by the respondent, but the respondent impeded the investigations into all complaints by his failure to cooperate with ongoing investigations. Even to this day nothing is presented to this court to substantiate the statements of counsel except argument.

We have reviewed the record and conclude that the factual findings and conclusions of law of the panel are supported by clear and convincing evidence. We are in agreement with the recommendation of the panel that the respondent be indefinitely suspended from the practice of law in Kansas. We conclude that the suspension should date from the date this court temporarily suspended the respondent from the practice of law in Kansas.

IT IS THEREFORE ORDERED that Patrick S. Dow be and he is hereby indefinitely suspended from the practice of law in the State of Kansas commencing on November 22, 1996.

IT IS FURTHER ORDERED that the respondent shall forthwith comply with Supreme Court Rule 218 (1996 Kan. Ct. R. Annot.

226), that the respondent pay the costs of this action, and that this order be published in the official Kansas Reports.